Affirmed and Opinion filed March 25,
2010

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00524-CR



Christopher Lee
Orsag, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 400th District Court

Fort Bend County, Texas

Trial Court
Cause No. 46,606 A



 

OPINION

Appellant Christopher Lee Orsag was found guilty by a
jury of felony driving while intoxicated.  The trial court assessed punishment
of four years in the Texas Department of Criminal Justice, Institutional
Division, probated for four years, and a $1,000 fine.  On appeal, Orsag raises
four issues: (1) the trial court erred in overruling his motion to suppress;
(2) the evidence was legally insufficient to prove he had previously been
convicted two or more times of the offense of driving while intoxicated; (3)
the trial court erred in overruling his objection to the State’s alleged
misstatement of the law in its opening statement; and (4) the trial court erred
in overruling his objection to the admissibility of certain documents.  We affirm.

I

On the evening of March 9, 2009, Officer Danny
Cornelius, Jr., of the Sugar Land Police Department was sitting in his patrol
car observing northbound traffic on U.S. Highway 59.  Across the divided
highway, Cornelius saw a blue Toyota pickup speeding.  Using his laser device,
he clocked the pickup at 90 miles per hour in a 65-miles-per-hour zone. 
Because Cornelius was unable to cross the divided freeway, he broadcast a
description of the pickup to other officers.

Sergeant Wayne Coleman of the Sugar Land Police
Department was on patrol and traveling southbound on the highway and saw Orsag’s
blue Toyota pickup.  Based on the dispatch call, Coleman turned on his lights
to signal Orsag to stop.  By the time Coleman approached Orsag’s vehicle,
traffic had slowed due to construction requiring drivers to merge into fewer
lanes.  Orsag was not speeding when Coleman stopped him.  At first, Orsag moved
to the left side of the road next to a concrete barrier, and Coleman had to direct
Orsag to pull over to the right side of the road where there was a shoulder.  Coleman
did not confirm with Cornelius that the vehicle he stopped was the same vehicle
Cornelius saw speeding.

When Coleman approached Orsag and asked him for his
identification, he noticed that Orsag’s eyes were bloodshot and red and his
eyelids were very droopy.  Coleman also noticed a faint odor of alcohol and a
very strong odor of tobacco on Orsag’s breath.  Orsag denied drinking, but his
passenger, his fiancé Holli Woodling, confirmed that he had two beers that
night while they were at the rodeo.  After Orsag again denied drinking, Coleman
performed field-sobriety tests on him.  Based on Orsag’s performance, Coleman
arrested Orsag for DWI and took him to jail.  At jail, Orsag refused to take a
breath test, and evidenced his refusal by signing a “DIC-24” form.

II

In his first issue, Orsag contends the trial court
erred in overruling his motion to suppress on the grounds that he was illegally
seized without reasonable suspicion in violation of the Fourth Amendment of the
United States Constitution.  Specifically, Orsag contends Coleman stopped him without
reasonable suspicion or probable cause because the stop was based solely on
another officer’s police-radio broadcast that he had observed a blue Toyota
pickup speeding, and Coleman did not observe Orsag speeding or committing any
other offense.  Based on the totality of the circumstances, Orsag contends, a
reasonable officer could not have pointed to specific and articulable facts to
warrant a suspicion that Orsag’s vehicle—as opposed to another vehicle—was the
same vehicle reported on the police broadcast.

A

            We
review the trial court’s ruling on a motion to suppress under an
abuse-of-discretion standard.  Shepherd v. State, 273 S.W.3d 681, 684
(Tex. Crim. App. 2008).  We view the evidence adduced in the light most
favorable to the trial court’s ruling.  Id.  We give almost total
deference to a trial court’s express or implied determination of historical
facts and review de novo the court’s application of the law of search and
seizure to those facts.  Id.  

            Law-enforcement
officers may stop and briefly detain persons suspected of criminal activity on
less information than that required for probable cause to arrest.  See Terry
v. Ohio, 392 U.S. 1, 22 (1968); Chapnick v. State, 25 S.W.3d 875,
877 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d).  An officer must have
reasonable suspicion to justify an investigatory stop.  See United States v.
Sokolow, 490 U.S. 1, 7 (1989).  Reasonable suspicion for an investigatory
detention arises when an officer has specific articulable facts which, premised
on his experience and personal knowledge and coupled with the logical
inferences from those facts, warrant intruding on the detained citizen’s
freedom.  Chapnick, 25 S.W.3d at 877.  The validity of the stop is
determined from the totality of the circumstances.  Id. (citing Sokolow,
490 U.S. at 8).

B

1

            As
an initial matter, Orsag contends that we may consider only the evidence
adduced before the trial court ruled on the suppression motion.  On these
facts, we disagree. 

            Generally,
the appellate court reviews the trial court’s ruling in light of what was
before it at the time the ruling was made.  See Rangel v. State, 250
S.W.3d 96, 97–98 (Tex. Crim. App. 2008); Weatherred v. State, 15 S.W.3d
540, 542 (Tex. Crim. App. 2000).  This general rule does not apply, however,
when the alleged error is the admission of evidence at trial and the issue was
consensually litigated at trial.  See Rachal v. State, 917 S.W.2d 799,
809 (Tex. Crim. App. 1996); see also Gutierrez v. State, 221 S.W.3d 680,
687 (Tex. Crim. App. 2007) (“[W]hen the parties subsequently re-litigate the
suppression issue at the trial on the merits, we consider all evidence, from
both the pre-trial hearing and the trial, in our review of the trial court’s
determination.”).

            Here,
unlike most cases, the motion to suppress was not litigated in a pretrial
hearing.  Instead, Orsag’s counsel interjected the motion during the State’s
examination of its second witness.  The State’s first witness was Officer
Cornelius.  Cornelius testified that he was working on a selective traffic-enforcement
assignment primarily designed to identify intoxicated drivers when he observed
a blue Toyota pickup speeding.  He was unable to pursue the vehicle because it
was in the southbound lanes of Highway 59 and he was facing the northbound
lanes, so he radioed a description of the vehicle and that it was speeding to
other officers.  He had no further involvement in the case.  

            The
State’s second witness, Sgt. Coleman, testified that he was on patrol in his
marked police cruiser on Highway 59 when he received Cornelius’s dispatch call
concerning a blue Toyota pickup truck traveling southbound at 90 miles per
hour.  Coleman also was working on the selective traffic-enforcement
assignment.  He testified that, at the time of the call, Cornelius broadcast
that he was in the 15,000 block of the highway, and Coleman was located “fairly
close” in the 14,500 block of the highway on the opposite side.  Coleman
testified that, as soon as he heard Cornelius’s broadcast, he “knew [he] was
close” and so he “got on the accelerator” to see if he could catch the speeding
vehicle.  Near the University Boulevard exit, the traffic slowed as the roadway
narrowed down to one lane due to construction.  Coleman testified it was at
this point that he saw Orsag’s vehicle and stopped him.  As the State began to
question Coleman concerning his contact with Orsag, defense counsel moved to
suppress “all evidence obtained from the point of the stop forward” because the
State failed to establish any probable cause or reasonable suspicion to stop
Orsag.  After a bench conference, the trial court overruled the motion to
suppress.  No findings of fact or conclusions of law were made.  

            Immediately
after the trial court denied Orsag’s motion to suppress, the State asked
Coleman whether he saw any other blue Toyota pickups at the time he stopped
Orsag, and Coleman answered, “No.”  Coleman then testified that he stopped
Orsag at 11:15 p.m., “right after” Officer Cornelius had spotted him.  Orsag
did not object to this line of questioning.  Indeed, Orsag cross-examined
Coleman concerning the reasonableness of the stop, and he raised the issue repeatedly
throughout the trial.  Orsag also moved for a directed verdict on the ground
that the State had failed to prove there was reasonable suspicion to stop him, he
began his closing argument to the jury with the issue, and the jury was
instructed on reasonable suspicion.  Accordingly, on these facts, we will
consider the evidence adduced at trial both before and after the court ruled on
Orsag’s motion to suppress.

2

            In
addition to the above testimony, Sgt. Coleman testified on cross-examination
that his decision to stop Orsag was based on Officer Cornelius’s observations
of a “blue Toyota pickup,” and that he did not see Orsag do anything illegal.  Coleman
admitted Cornelius did not confirm that Orsag’s vehicle was the same one he saw
speeding.  Coleman acknowledged that Cornelius gave no further details such as a
description of the driver, the model of the truck, whether the truck was large
or small, whether it was a two-door or a four-door truck, or whether it had any
distinguishing features.  Coleman acknowledged that a better description “would
have helped.”  He also admitted that he did not know if the speeding vehicle
continued southbound or exited the highway.  But Coleman also testified that he
knew he had the right vehicle because “it was the only blue Toyota pickup in
the inside lane that he said was going that fast” and he did not see any other
blue Toyota pickups at the time.  On redirect, Coleman testified that he was looking
for a blue Toyota speeding in the southbound inside (left) lane, and that it
was was “just seconds” before he was at the same location where Coleman made
the dispatch call.

            Holli
Woodling, Orsag’s fiancée, testified that Orsag drove a blue Toyota Tacoma and
that he was driving south from Houston on Highway 59 towards Richmond-Rosenberg
when Coleman stopped them.  She also testified that they had been driving in
the left lane.  Orsag’s counsel asked Woodling about the exits on Highway 59
and the distances between them.  Woodling testified that the Williams Trace and
University Boulevard exits were “pretty close” to one another.  Woodling
further testified that there were two exits between Williams Trace and
University Boulevard, namely Sweetwater and Highway 6, and she “guess[ed]” the
distance between Williams Trace and University Boulevard was “about two, two
and a half miles, maybe three.”  Woodling also estimated that the time it would
take to drive this distance was “about ten minutes” due to the traffic.  She
testified that, although she was not sure if the Highway 6 and Sweetwater exits
were open that night, she believed it would be possible for a vehicle to have
exited those exits.  On redirect, Woodling conceded she could not remember for
certain if those exits were open or closed that night.  

C

            Recognizing
that the concept of reasonable suspicion cannot be reduced to “a neat set of
legal rules,” Klare v. State, 76 S.W.3d 68, 73 (Tex. App.—Houston [14th
Dist.] 2002, pet. ref’d), Orsag nonetheless proposes we consider the following
six factors: (1) the particularity of the description of the offender or the
vehicle in which he fled; (2) the size of the area in which the offender might
be found, as indicated by such facts as the elapsed time since the crime
occurred; (3) the number of persons in that area; (4) the known or probable
direction of the offender’s flight; (5) observed activity by the particular
person stopped; and (6) knowledge or suspicion that the person or vehicle
stopped has been involved in other criminality of the type presently under
investigation.  4 Wayne R. LaFave, Search and Seizure: A Treatise on the
Fourth Amendment § 9.4[g] (3d ed. 1996).  Orsag also suggests we consider another
factor not identified by Professor LaFave—the urgency of the situation. 
Applying these factors, Orsag argues that Sgt. Coleman lacked reasonable
suspicion to stop Orsag.

            Specifically,
Orsag contends that it was not reasonable for Sgt. Coleman to stop him because
the description of a “blue Toyota pickup,” without additional information such
as a license-plate number, description of the occupants, or other
distinguishing information, is too general a description, “considering the
number of pickup trucks traveling the freeways of Houston, Texas on any given
Friday night” in heavy traffic.  Orsag points out that Sgt. Coleman
acknowledged that a better description would have helped his investigation, and
Officer Cornelius never confirmed Orsag’s vehicle was the same one he saw. 
Thus, Orsag argues, Coleman’s stop of Orsag’s vehicle could only be based on a
hunch that it was the same vehicle Cornelius saw speeding.  Orsag also argues that
the evidence of the time and distance between the dispatch and the stop—particularly
Woodling’s testimony that due to traffic it would have taken about ten minutes
to travel the two- to three-mile distance from the Williams Trace exit to the University
exit—makes it possible the suspect could have taken one of the exits in the
vicinity.  Although Orsag acknowledges that neither Coleman nor Cornelius
testified concerning the amount of traffic on Highway 59 that night, he
contends it can be inferred that traffic was heavy because it was Friday night
on a major freeway and the officers were working overtime patrolling both sides
of the freeway looking for intoxicated drivers.  Consequently, the “sheer
number” of vehicles on the road, coupled with Cornelius’s general description
and the time and distance between the dispatch and the stop would not warrant
an officer to reasonably suspect that Orsag’s vehicle was the same one
Cornelius saw speeding.  Orsag also argues it is unreasonable for Coleman to
stop the first blue Toyota pickup he saw, when the probable direction the
suspect continued to travel was unknown and the suspect had several
opportunities to exit the highway.  Orsag also contends that Coleman did not
observe him doing anything suspicious, there was no evidence Coleman knew of
Orsag or his vehicle before the stop, and there was no urgency to stop him
because there was no reason to suspect that he presented any danger to himself
or others, as Coleman had no reason to suspect he was intoxicated before he
stopped him.

            We
do not disagree that some or all of the factors Orsag identifies may be relevant
to the application of the law to any given set of facts, but we must consider
the totality of circumstances in the particular case being reviewed to
determine whether a police officer had reasonable suspicion to stop the
defendant.  See United States v. Arvizu, 534 U.S. 266, 274
(2002); Sokolow, 490 U.S. at 8.  Here, the stop was based on a report
from a fellow officer, who was known to the arresting officer, and who informed
the arresting officer that a vehicle was committing the traffic offense of
speeding.[1]
 The actual basis for stopping a vehicle need not arise from the officer’s
personal observation, but may be supplied by information acquired from another
person.  Brother v. State, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005). 

            Officer
Cornelius, who saw the speeding vehicle, informed Sgt. Coleman of the street on
which the suspect vehicle was traveling, the block of the street in which it
was traveling, the direction it was traveling, the lane in which it was
traveling, the make of the vehicle (Toyota pickup), and the color of the
vehicle (blue).  Coleman testified he saw a vehicle matching this description within
minutes of the dispatch call, a short distance from where it was seen speeding,
nearing a construction zone where the vehicle could not easily evade him.  He
also saw no other blue Toyota pickups in the area.  On the totality of these
circumstances, we conclude that Sgt. Coleman had a reasonable basis to conduct
a traffic stop on Orsag’s vehicle.  See Mount v. State, 217
S.W.3d 716, 728–29 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding
reasonable suspicion existed to stop “light colored” Cadillac pickup seen
within minutes after officer received call about a stolen white Cadillac pickup);
Louis v. State, 825 S.W.2d 752, 756 (Tex. App.—Houston [14th Dist.]
1992, pet. ref’d) (concluding reasonable suspicion existed to stop three black
males in light tan colored Cadillac based on report of two black males driving
away from a robbery in a white Oldsmobile).

            Orsag
attempts to distinguish Mount and Louis, arguing that in both
cases the proximity between the reported location of the suspect’s vehicle and
the location where the officer saw a similarly described vehicle was
exceptionally close.  In Mount, the officer pulled over a “‘tan or
goldish colored or silver, light colored Cadillac pickup truck’” a few minutes
after hearing a report of a possible theft of a white pickup truck about a half
a block from the location where the officer saw the vehicle.  217 S.W.3d at
720.  The court held that the officer was justified in searching for and
stopping a vehicle that was similar to the described vehicle.  Id. at 728–29. 
In Louis, the officers stopped three black men in a light tan colored
Cadillac that was the only car on the same street where a store had been robbed
and was less than two miles from the robbery scene.  825 S.W.2d at 754.  The
court held that the officer was justified in stopping the vehicle based on a
report of a robbery by two black men who drove away in a white Oldsmobile,
because it was reasonable for the officer to infer that the description given
might not be completely accurate and the additional male could have been a
getaway driver who did not enter the store.  Id. at 756.

            In
contrast to Mount and Louis, Orsag contends, the size of the area
the suspect’s vehicle could have traveled between Cornelius’s initial
observation and Coleman’s stop spanned up to three miles of freeway with four
possible exits and a possible time frame of ten minutes.  But Orsag’s argument overstates
Woodling’s testimony concerning time and distance and fails to account for the
totality of the circumstances.  Woodling’s testimony was tentative, primarily consisting
of guesses or estimates concerning the distance between the exits and the time
it would take to travel from one to another, and she could not say with
certainty whether the exits along the route were open or closed at the time. 
In contrast, Coleman testified that he and Cornelius were “fairly close” but on
opposite sides of the highway, with Colman in the 14,500 block and Cornelius in
the 15,000 block, when Cornelius broadcast that he saw a blue Toyota pickup
traveling at 90 miles per hour in a 65-mile-per-hour zone.  Coleman also
testified that he reached Cornelius’s location “within seconds” of his
broadcast, and he stopped Orsag at 11:15 p.m., “right after” Cornelius reported
the speeding vehicle.  Coleman also saw no other blue Toyota pickups in the
area.  Considering the totality of the circumstances, therefore, we disagree
that Mount and Louis compel a reversal of the trial court’s
ruling.  See Mount, 217 S.W.3d at 729; Louis, 825 S.W.2d at 754–756.

            Orsag
also contends this case is more analogous to Glass v. State, 681 S.W.2d
599 (Tex. Crim. App. 1984), and McMillan v. State, 609 S.W.2d 784 (Tex.
Crim. App. [Panel Op.] 1980).  In Glass, an unidentified caller reported
that occupants of two automobiles described as a brown-over-beige El Camino and
a blue Fairlane were shooting at each other at or near the intersection of two
streets.  681 S.W.2d at 600.  Two patrol officers heard the dispatch and went
to the intersection, but initially saw no unusual activity occurring.  Id. 
After three or four minutes, however, they saw a brown-over-beige El Camino
traveling on one of the streets, and they stopped the vehicle.  Id.  The
court held that the officers lacked reasonable suspicion to stop the vehicle
because the record did not reflect when the alleged incident occurred or when
the anonymous report was received, and without any proximity of the stop to the
alleged events “it would not be reasonable to conclude, solely on the basis of
the match of color and make of the car, that the car stopped was the car
involved in the reported incident.”  Id. at 601.  In contrast, the
broadcast in this case was not based on an alleged incident that occurred at an
unknown time and was reported at an unknown time by an anonymous caller.  Here,
Officer Cornelius, who testified at trial, initially observed the speeding
vehicle and immediately broadcast a description of the vehicle’s location, description,
and direction of travel to other officers.  Shortly after the broadcast, Sgt.
Coleman stopped a vehicle matching the description given.  Thus, the concerns
expressed in Glass about the absence of any proximity between the
alleged incident and the stop are not present in this case.

            In
McMillan, officers on patrol in the early morning hours received a
dispatch to investigate a suspicious automobile seen driving slowly with its lights
off in a mobile-home park.  609 S.W.2d at 785.  The only description of the car
was that it was “small and compact.”  Id.  On the way to the park, the
officers saw a car about four blocks away, but they were unable to determine
anything about the car other than distinguishing its taillights when its brakes
were on.  Id.  After going to the mobile-home park and failing to find
the suspicious automobile, they continued to patrol when they saw a vehicle
being driven with its lights off.  The officers were unable to identify what color
or kind of vehicle it was, but they believed it could have been the same
vehicle they had seen earlier based on the taillights.  Id. at 786.  The
officers chased the vehicle, but it eluded them.  About forty minutes after the
initial dispatch, as the officers parked and waited where they had seen the
first vehicle, they saw a maroon Camaro approach and stop at the intersection. 
When the Camaro turned, the officers were able to see its taillights, and
believing it to be the same vehicle they had seen earlier, stopped it.  Id.
 The court held that the stop was unlawful, in part, because one of the
officers testified that “he really had no idea” if the appellant’s vehicle was
the same one they had chased earlier, and the other officer testified that all
he could see of the vehicle was its taillights, which were “‘very similar’” and
so it was “‘probably the same vehicle.’”  Id.  The court stated that
“[T]he inarticulate hunch, suspicion, or good faith in suspecting the
appellants’ vehicle to be the one the officers had seen earlier was
insufficient to warrant the detention as an investigative stop.”  Id.  

            McMillan
is distinguishable because here, Cornelius’s description of the speeding
vehicle was considerably more detailed than “small and compact,” and shortly
after Cornelius broadcast the description of a blue Toyota pickup speeding
southbound on Highway 59, Coleman stopped Orsag’s vehicle, which matched the
description given.  Although Coleman did admit that it was “possible” he
stopped the wrong vehicle, he also testified that the vehicle matched the
description Cornelius gave, he saw it shortly after receiving Cornelius’s
broadcast, and he saw no other blue Toyota pickups in the area.  Accordingly,
we do not consider either Glass or McMillan controlling.

            Because
we have concluded that the trial court did not abuse its discretion in
determining that Sgt. Coleman had reasonable suspicion to stop Orsag’s vehicle,
we overrule Orsag’s first issue.

III

            In
his second issue, Orsag contends the evidence is legally insufficient to prove
that he had previously been convicted two or more times of the offense of
driving while intoxicated.  Specifically, he contends the State failed to link
three prior judgments to him through Woodling’s testimony and the jury’s
comparison of Orsag’s signature to court documents filed in this case.

A

            In
reviewing the legal sufficiency of the evidence to support a conviction, the
critical inquiry is whether, considering the evidence in the light most
favorable to the verdict, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Vasquez v. State, 67 S.W.3d 229,
236 (Tex. Crim. App. 2000).  Although we consider all evidence presented at
trial, we may not re-weigh the evidence and substitute our judgment for that of
the jury.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  Further,
the standard of review on appeal is the same for both direct- and
circumstantial-evidence cases.  Guevara v. State, 152 S.W.3d 45, 49
(Tex. Crim. App. 2004).  The jury is the exclusive judge of the credibility of
the witnesses and of the weight to be given their testimony, and it is the
exclusive province of the jury to reconcile conflicts in the evidence.  Mosley
v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998).  

            To
establish that a defendant has been convicted of a prior offense, the State
must prove beyond a reasonable doubt that (1) a conviction exists, and (2) the
defendant is linked to the conviction.  Flowers v. State, 220 S.W.3d
919, 921–22 (Tex. Crim. App. 2007).  No specific document or mode of proof is
required to prove these two elements.  Id.  Although evidence of a
certified copy of a final judgment and sentence may be a preferred and
convenient means, the State may prove both of these elements in a number of
different ways, including (1) the defendant’s admission or stipulation, (2)
testimony by a person who was present when the person was convicted of the
specified crime and can identify the defendant as that person, or (3)
documentary proof (such as a judgment) that contains sufficient information to
establish both the existence of a prior conviction and the defendant’s identity
as the person convicted.  Id.  Any type of evidence, documentary or
testimonial, might suffice.  Id. at 922.  Further, the State may use
circumstantial evidence to prove the defendant is the same person named in the
alleged prior convictions.  Gilmore v. State, No. 14-06-00620-CR, 2007
WL 2089294, at *6 (Tex. App.—Houston [14th Dist.] July 24, 2007, pet. ref’d)
(mem. op., not designated for publication) (citing Human v. State, 749
S.W.2d 832, 835–36, 839 (Tex. Crim. App. 1988) (op. on reh’g)).  The factfinder
looks at the totality of the evidence to determine whether the State proved the
prior conviction beyond a reasonable doubt.  Id. (citing Flowers,
220 S.W.3d at 923).

B

            At
trial, the State presented three certified judgments and sentences reflecting
that a Christopher Orsag or Christopher Lee Orsag was convicted of the
following offenses:

·       
State’s
Exhibit 4:  Driving while intoxicated–second offense, on February 3, 2000, in
Brazos County;

·       
State’s
Exhibit 5:  Driving while intoxicated, on February 9, 1995, in Harris County;
and 

·       
State’s
Exhibit 6:  Driving while intoxicated–Class B, on August 11, 2000, in Brazoria
County.  

            Holli
Woodling, Orsag’s fiancé, testified that she had known Orsag about thirteen or
fourteen years, and that she was familiar with his handwriting.  She testified
that she was with Orsag when he was stopped for DWI in Harris County in 1995,
and testified that the signature on State’s Exhibit 5 was Orsag’s signature. 
She also testified that she “knew about” “his DWI in Brazos County” and
testified that she believed the signature on State’s Exhibit 4 was Orsag’s.[2]  She also
testified the signature on State’s Exhibit 6 was Orsag’s.  On
cross-examination, Woodling testified that she had no personal knowledge of
whether Orsag actually signed the documents, and agreed that “the best you can
tell us [is] that that appears to resemble his signature” on each of the
documents.  She also testified she did not understand the difference between a
conviction and a deferred adjudication, and she had no personal knowledge of
whether any plea bargains occurred in any of Orsag’s prior cases.  

            In
addition, shortly before the end of the State’s case, the State offered
Exhibits 7, 8, and 9, certified copies of criminal-case-reset forms allegedly
signed by Orsag in this case.  Orsag’s counsel objected to the forms as not
relevant, but the State argued they were relevant for signature comparison by
the jury.  The trial court overruled the objection and admitted the exhibits. 

C

            Orsag
contends Woodling’s testimony is insufficient to link Orsag to the prior
convictions because on cross-examination she expressed uncertainty about her
identifications of his signature, and, with respect to State’s Exhibit 6, she
testified only that it “looked like” Orsag’s signature.  Further, citing Cain
v. State, 468 S.W.2d 856, 859 (Tex. Crim. App. 1971), Orsag argues that the
jury was not permitted to make a handwriting comparison.  In Cain, the
Court of Criminal Appeals stated:

The question before us is whether
the State sufficiently established the identity of the appellant as the person
so previously convicted.  We conclude that under the circumstances of this
case, where handwriting samples are introduced without expert testimony and the
jury alone must make the comparison, and there is no other evidence to connect
the appellant with the prior convictions, such identity has not been
sufficiently established.

Id.
at 859.  

            The
State responds that the admission of the certified judgments and sentences of
the prior convictions, Woodling’s testimony concerning her knowledge of Orsag’s
prior convictions,[3]
her comparison of the signatures on the judgments and sentences with Orsag’s
handwriting, and the admission of the certified copies of reset forms Orsag
signed, which the jury could use to make its own handwriting comparison, were
sufficient to prove Orsag’s prior convictions.  The State also notes that the
Court of Criminal Appeals overruled Cain in Littles v. State, 726
S.W.2d 26, 32 (Tex. Crim. App. 1984) (op. on reh’g), to the extent that it held
that that there were exclusive means of proving up a defendant’s identity. 
Concerning the reset forms, the State points out that article 38.27 of the
Texas Code of Criminal Procedure provides in relevant part that “[i]t is
competent to give evidence of handwriting by comparison, made by experts or by
the jury.”  See Tex. Code Crim. Proc. art. 38.27 (Vernon 2005).  The
State also points out that Orsag’s signature was on State’s Exhibit 1, the
“DIC-24” form, and this exhibit was admitted without objection and was
available to the jury for signature comparison.  Taken together, the State
argues, these forms of proof are sufficient under Flowers to enable the
jury to find beyond a reasonable doubt that the convictions existed and that
Orsag was the one convicted.  See Flowers, 220 S.W.3d at 924.

            Orsag
contends that the State’s evidence is insufficient to link him to the prior
convictions because it does not rise to the level of proof held to be
sufficient in Flowers and Bautista v. State, 642 S.W.2d 233 (Tex.
App.—Houston [14th Dist.] 1982, pet. ref’d).  In Flowers, the State
offered into evidence a certified copy of the appellant’s driver’s license
record and a computer printout from the Dallas County clerk showing a prior
conviction for a DWI.  Id. at 920–21.  Both documents contained the same
name, date of birth, address, personal descriptors, and information concerning
the DWI conviction.  Id. at 921.  The driver’s license record also had a
picture of the person named on the document so that the fact finder could
compare it to the person in the courtroom.  Id. at 925.  The court held
that the documents, considered together, were sufficient to prove beyond a
reasonable doubt the existence of the appellant’s prior DWI conviction.  Id. 
In Bautista, this court held the evidence was sufficient to establish
that the appellant was the same person named in prior judgments when the State
presented testimony from a parole officer who identified the appellant as the
same person who reported to him under the prior judgments.  642 S.W.2d at
236–37.

            Here,
we do not have records containing photographs of the previously convicted
person or testimony from a parole officer concerning his knowledge of a
defendant’s prior convictions.  Nevertheless, in Littles v. State, the
Court of Criminal Appeals stated that even unorthodox methods of proof can be
sufficient to prove a prior conviction.  726 S.W.2d 26, 32 (Tex. Crim. App.
1984) (op. on reh’g) (“[W]here as in the instant case, the proof [of the
defendant’s prior conviction] though unorthodox, was clearly sufficient, no
error will be found.”).  Further, the Flowers court likened evidence
that may be used to prove a prior conviction to pieces of a jigsaw puzzle:

[O]rdinarily the proof that is
adduced to establish that the defendant on trial is one and the same person that
is named in an alleged prior criminal conviction or convictions closely
resembles a jigsaw puzzle.  The pieces standing alone usually have little
meaning.  However, when the pieces are fitted together, they usually form the
picture of the person who committed that alleged prior conviction or
convictions.   

220
S.W.3d at 923 (citing Human, 749 S.W.2d at 835–36).  The court went on
to explain that “[r]egardless of the type of evidentiary puzzle pieces the
State offers to establish the existence of a prior conviction and its link to a
specific defendant, the trier of fact determines if these pieces fit together
sufficiently to complete the puzzle” based on the totality of the evidence
admitted.  Id.  

            The
puzzle pieces before the jury in this case included the following: (1)
Woodling’s testimony that she was familiar with Orsag’s handwriting and that in
her opinion the signatures on the prior judgments and sentences from Brazos,
Brazoria, and Harris Counties were Orsag’s; (2) Woodling’s testimony that she
was with Orsag when he was arrested for DWI in Harris County and she knew about
Orsag’s “DWI” in Brazos County; and (3) documents purportedly signed by Orsag
in this case, which the State offered for the purpose of enabling the jury to
make its own handwriting comparison.

            We
disagree with Orsag that Woodling’s testimony concerning his signatures was too
uncertain to constitute probative evidence.  The testimony Orsag refers to was
Woodling’s admission that she had no personal knowledge that Orsag actually
signed the documents because she was not with him when he signed them, and she
had no “other” personal knowledge of whether he actually signed the originals. But
those admissions do not negate the probative value of Woodling’s prior testimony. 
Woodling was Orsag’s fiancé, she had known him for over thirteen years, and she
testified that she was familiar with his handwriting and signature.  Her
testimony that the signatures “resemble” or “look like” Orsag’s signature is
competent opinion testimony the jury was entitled to consider.  See Denham
v. State, 574 S.W.2d 129, 131 (Tex. Crim. App. 1978) (opinions of lay
witnesses, when competent, are admissible concerning handwriting).

            Additionally,
the jury had before it State’s Exhibit 1, which contained Orsag’s signature and
was admitted without objection, to use to compare to the signatures on State’s
Exhibits 4, 5, and 6.[4]
 Assuming Cain’s holding that a jury’s comparison of handwriting samples
is insufficient to establish identity absent some additional evidence linking
the appellant to the prior conviction is still good law, the case is
distinguishable.  Here, the jury also had before it Woodling’s testimony, and
so there was more evidence connecting Orsag to the prior convictions than just
a comparison of his signature.  Cf. Cain, 468 S.W.2d at 859; see also
Meek v. State, No. 03-05-00269-CR, 2006 WL 2080644, at *3 (Tex. App.—Austin
July 28, 2006, no pet.) (mem. op., not designated for publication) (stating
that, in addition to considering other evidence, the jury could compare
signatures on fingerprint cards to defendant’s signature to link prior offenses
to defendant, explaining that “[t]he State need not present expert testimony
regarding the handwriting comparison because the jury is capable of making such
a comparison” and citing Texas Code of Criminal Procedure article 38.27).  

            Therefore,
we hold that on these facts the means used were sufficient under the totality
of the evidence admitted to show that Orsag was the person convicted in the
prior cases.  See Flowers, 220 S.W.3d at 922–23.  

IV

            In
his third issue, Orsag contends the trial court erred in overruling his
objection to the State’s alleged misstatement of the law in its opening
statement.  Specifically, he contends the prosecutor’s statement during opening
argument that “any loss of mental or physical faculties” constitutes
intoxication was a misstatement of the law.  

A

            During
the State’s opening statement, the following exchange occurred:

[State]:  And the law was any
loss of mental or physical faculties.  That was the strict standard.  That was
what we talked about yesterday, and that’s what the State has to prove - - any
loss, not drunk.

[Defense]:  Judge, I’m going to
object to the extent he’s misstating the law.  The law as to intoxication is
defined in the Penal Code.  He’s straying from that definition.

[State]:  That’s exactly the
definition.

[The Court]:  Overruled.

[State]:  It’s
any loss. . . .

Later,
during closing argument, the issue arose again:

[State]:  But the actual law, as
you know from voir dire, is intoxicated, any loss, if he has any loss of the
normal use of his faculties.

[Defense]:  Misstating the law.

[State]:  That’s exactly the law.


[Defense]:  That’s not the law. 
Loss of the normal use.

[State]:  It’s the law.

[The Court]:  Isn’t that - - I
think that’s what he said.

[State]:  That’s exactly, it’s
the law.

[The Court]: 
The jury’s got the law in the charge.

Orsag
contends the State misstated the law by defining the term “intoxicated” as “any
loss of mental or physical faculties.”[5] 
The relevant legal definition of “intoxicated” is “not having the normal
use of mental or physical faculties by reason of the introduction of alcohol, a
controlled substance, a drug, a dangerous drug, a combination of two or more of
those substances, or any other substance into the body.”  Tex. Penal Code Ann. §
49.01(2)(a) (Vernon 2003) (emphasis added).  The jury charge tracked the
statutory definition.  

B

            Orsag
contends the definition of “intoxicated” does not include the term “any loss,”
and therefore the trial court erred by overruling his objection to this
misstatement of the law.  Further, Orsag argues that the error affected his
substantial rights because the jury was allowed to convict him based on an incorrect
understanding of the law, and the trial court compounded the error by
overruling Orsag’s attempts to correct the misstatement of law.  

            To
fall within the realm of proper jury argument, the argument must encompass one
of the following general areas: (1) summation of the evidence presented at
trial; (2) a reasonable deduction drawn from the evidence; (3) an answer to the
opposing counsel’s argument; or (4) a plea for law enforcement.  Wesbrook
v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).  It is not error
for the State to quote or paraphrase the jury charge.  Whiting v. State,
797 S.W.2d 45, 48 (Tex. Crim. App. 1990).  But it is error for the State to
present a statement of the law that is contrary to that presented in the charge
to the jury.  Id.

            We
will assume for purposes of argument that the State misstated the law as
appellant contends.  Because any error is nonconstitutional, however, we will
disregard it if it does not affect Orsag’s substantial rights.  See Tex.
R. App. P. 44.2(b); Arnold v. State, 234 S.W.3d 664, 674 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  A substantial right is affected when
the improper jury argument has a substantial and injurious effect or influence
on the jury’s verdict.  Arnold, 234 S.W.3d at 674.  To determine whether
an improper jury argument is harmful, we consider (1) the severity of the
misconduct or prejudicial effect, (2) any curative measures taken, and (3) the
certainty of conviction or punishment assessed absent the misconduct.  Id.
 Absent evidence to the contrary, the jury is presumed to follow the
instructions set forth in the court’s charge.  Hutch v. State, 922 S.W.2d
166, 172 (Tex. Crim. App. 1996).

C

            Here,
although the State paraphrased “loss of normal use” as “any loss” of mental or
physical faculties, the degree of prejudicial effect, if any, was minimal. 
Further, the jury was correctly charged on the legal definition of
intoxication.  The charge was read aloud to the jury, and the trial court later
specifically referred to the definition of intoxication in the charge in
response to Orsag’s objections to the State’s argument.  Orsag contends the
jury could have found that he was not intoxicated as defined in the charge
because the evidence of intoxication hinged on Sgt. Coleman’s testimony alone,[6] and so the
State’s modified definition “could have easily affected the jury’s verdict.”  But
there was substantial evidence that Orsag was intoxicated.  Orsag’s fiancé
testified that Orsag drank that night, he smelled of alcohol, he pulled over to
the wrong side of the road, he exhibited signs of intoxication on all of the
field-sobriety tests, and he refused a breath test.  Therefore, the evidence is
sufficient for the jury to find Orsag was intoxicated, whether it considered
either the State’s interpretation of the definition or the definition contained
in the charge.  

            Finally,
Orsag argues that, by allowing the State to misstate the law, “the only
reasonable conclusion the jury could draw was that the prosecutor was stating
proper law.”  See Kincaid v. State, 534 S.W.2d 340, 342 (Tex. Crim. App.
1976) (holding that trial court’s failure to sustain objection to prosecutor’s
misstatement of parole law to appellant’s detriment was harmful error and
noting that jury assessed maximum penalty allowed).  But the trial court
instructed the jury to follow the charge immediately after the last exchange
between the State and the defense concerning the definition of intoxication,
and Orsag fails to direct us to any evidence that the jury disregarded the
court’s charge.  The mere assertion that the jury “could” have been influenced
does not rise to the level of evidence rebutting the presumption that the jury
followed the charge.  

            Therefore,
we conclude that the State’s misstatement of the law to the jury, if any, did
not have a substantial and injurious effect or influence in finding Orsag
guilty.  See Tex. R. App. P. 44.2(b); Herrera v. State, 11 S.W.3d
412, 415–16 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d) (holding trial
court’s error in overruling objection to prosecutor’s misstatement of law of
intoxication that differed from definition in charge was harmless when there
was evidence supporting the jury’s verdict and it was presumed the jury
followed the instructions in the charge).  We overrule Orsag’s third issue.

V

            In
his fourth issue, Orsag contends the trial court erred in overruling his
objection to the admissibility of State’s Exhibits 7, 8, and 9, which were
certified copies of reset forms he allegedly signed.  Orsag contends the State
laid no foundation for the admission of the documents, presented no testimony
relating to the documents, and offered no evidence connecting any of the
signatures in those exhibits to him.  At trial, Orsag objected to the admission
of the documents on relevancy grounds, but the State argued that the documents
were relevant for signature comparison by the jury.  The trial court overruled
Orsag’s objection.

A

            Evidence
is relevant if it has “any tendency to make the existence of any fact that is
of consequence to the determination of the action more probable or less
probable than it would be without the evidence.”  Tex. R. Evid. 401.  We review
the trial court’s decision to admit or exclude evidence under an
abuse-of-discretion standard.  Casey v. State, 215 S.W.3d 870, 879 (Tex.
Crim. App. 2007).  A trial court abuses its discretion when its decision lies
outside the zone of reasonable disagreement.  Id.

            The
erroneous admission of evidence is nonconstitutional error.  See Johnson
v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  Any
nonconstitutional error that does not affect substantial rights must be
disregarded.  Tex. R. App. P. 44.2(b).  In determining whether a substantial
right is affected, we consider everything in the record, including evidence of
the defendant’s guilt.  See Motilla v. State, 78 S.W.3d 352, 357–58
(Tex. Crim. App. 2002).  

B

            Assuming
the admission of State’s Exhibits 7, 8, and 9 was error, any error was harmless
because other evidence supported the jury’s finding that Orsag signed the
admitted judgments and sentences.  As noted above, Orsag’s fiancé testified
that she believed the signatures on State’s Exhibits 4, 5, and 6 were Orsag’s,
and she also testified about her own knowledge of Orsag’s prior arrests for
DWI.  The jury also had before it State’s Exhibit 1, the “DIC-24” form that
Orsag signed after his arrest, confirming that he refused to take a breath test. 
This exhibit was admitted into evidence without objection and was available for
the jury to use for signature comparison.  See Tex. Code Crim.  Proc. art.
38.27.  Further, Orsag never claimed State’s Exhibits 7, 8, and 9 did not
contain his signature, nor did he did he object on this basis.  Therefore, any
error in the admission of these forms for signature comparison was harmless.  See
Tex. R. App. P. 44.2(b).  

*
* *

            We
overrule Orsag’s issues and affirm the trial court’s judgment.








                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

Panel consists of Justices Yates, Seymore,
and Brown.

Publish
— Tex. R. App. P. 47.2(b).









[1]
Orsag argues that a traffic stop based solely on a radio dispatch from another
officer is insufficient to establish probable cause.  See Glass v.
State, 681 S.W.2d 599, 601 (Tex. Crim. App. 1984); State v. Jennings,
958 S.W.2d 930, 933 (Tex. App.—Amarillo 1997, no pet.).  These cases are
distinguishable, however, because the dispatch upon which the arresting officer
relied was based on an anonymous report or was relayed by an unknown officer
from an unknown source.  See Glass, 599 S.W.2d at 601–02; Jennings,
958 S.W.2d at 933. 





[2]
Orsag contends State’s Exhibit 4 was never identified by any witness and
Woodling never testified with respect to the signature on it.  The record shows
that the State asked Woodling about Orsag’s “DWI in Brazos County,” and then began
to ask Woodling to “identify the signature on State’s Exhibit – ,” when Orsag’s
counsel interrupted and asked to take Woodling on voir dire.  After the voir
dire examination, the State asked Woodling whether the signature on the
unidentified exhibit was Orsag’s, to which she answered, “Yes.”  Thus, the
State asked Woodling to identify the signature on the exhibit immediately after
asking her about Orsag’s “DWI in Brazos County,” which is the same county as
the judgment and sentence in Exhibit 4.  Further, the State asked Woodling
about State’s Exhibit 5 before it began to ask about the unidentified exhibit,
and asked about State’s Exhibit 6 after concluding its questioning concerning
the unidentified exhibit.  Thus, when read in context, it becomes clear that
the State was questioning Woodling concerning Orsag’s signature on Exhibit 4. 
Additionally, at the end of this line of questioning, the State asked whether
Orsag’s signature was “on all these documents,” to which Woodling answered,
“Yes.”  Immediately after that, the State offered Exhibits 4, 5, and 6, and
they were admitted over Orsag’s counsel’s objection.  Therefore, we disagree
with Orsag that no testimony was elicited concerning State’s Exhibit 4.





[3]
We note that Woodling did not specifically testify she was aware of prior
“convictions” as the State asserts, but she testified she was with Orsag in
1995 when he was stopped for DWI in Harris County (Exhibit 5), and she “knew
about” Orsag’s “DWI in Brazos County” (Exhibit 4).  This, in conjunction with
her confirmation that the prior judgments reflect Orsag’s signature, is some
evidence to support the prior convictions.  See Thomas v. State, No.
2-08-125-CR, 2009 WL 2356891, at *6 (Tex. App.—Fort Worth July 30, 2009, no
pet.) (per curiam) (mem. op., not designated for publication) (holding
defendant’s brother’s testimony that he knew the defendant had served time in
the penitentiary for “something happening at the MHMR home” and his
identification of his brother’s photograph in a pen packet was sufficient to
prove up the defendant’s prior conviction for sexual assault).





[4]
As discussed below, we assume for purposes of Orsag’s fourth issue that the
admission of State’s Exhibits 7, 8, and 9 for the purpose of handwriting
comparison by the jury was error.





[5]
To the extent Orsag complains of trial court error during the closing argument,
he did not obtain a ruling on his objection and therefore he has not preserved
the issue for review.  See Tex. R. App. P. 33.1; see also Cockrell v.
State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (“Before a defendant will
be permitted to complain on appeal about an erroneous jury argument . . . he
will have to show he objected and pursued his objection to an adverse
ruling.”).





[6]
Sgt. Coleman testified that his patrol car was an older model that did not
automatically begin recording when the overhead lights are activated, and he
admitted he erred in failing to turn on the video camera to record his
encounter with Orsag.  Consequently, the jury did not have video to accompany Coleman’s
testimony concerning Orsag’s behavior during the field-sobriety tests.  Orsag
also points to Coleman’s testimony that it was possible his opinion that Orsag
was intoxicated was incorrect, and his testimony that Orsag operated his
vehicle in a safe manner, he did not stumble or grab onto his vehicle for
support when he got out of it, and he appeared to have no problem balancing. 
But Coleman also testified that his opinion was that Orsag was intoxicated
because both his mental and physical faculties were impaired, he was unsteady
on his feet, his eyes were bloodshot, the odor of alcohol was on his breath, he
failed the field-sobriety tests, and he refused to perform the field-sobriety
tests at the jail or take the breath test.